ATTACHMENT #1

E-FILED
Thursday, 02 July, 2009 03:37:56 PM
Clerk, U.S. District Court, ILCD
Thursday, 08 March, 2007 08:37:13 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT PEORIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 06-10029 |
| LARRY J. CAFFIE, | ) ) | |
| Defendants. | ) ) | |

### AMENDED NOTICE OF INTENT
### TO USE EVIDENCE OF PRIOR CONVICTION

Now comes the United States of America, by its attorneys, Rodger A. Heaton, United States Attorney and John H. Campbell, Assistant United States Attorney for the Central District of Illinois, and hereby notifies the defendant, Larry J. Caffie, and his counsel, Hal Jennings, that it intends to seek an enhancement of the defendant's sentence under 21 U.S.C. §851 for the following felony drug conviction:

| | | |
|---|---|---|
| 02 CF 1286 | Winnebago County | Delivery of Controlled Substance |
| 99 CF 237 | Kane County | Delivery of Controlled Substance |

Respectfully submitted,

UNITED STATES OF AMERICA

RODGER A. HEATON
UNITED STATES ATTORNEY

s/: JOHN H. CAMPBELL
JOHN H. CAMPBELL
Assistant United States Attorney
One Technology Plaza
211 Fulton Street, 4th Floor
Peoria, Illinois 61602
Telephone: 309.671.7050

ATTACHMENT #2

IN THE CIRCUIT COURT OF <u>WINNEBAGO</u> COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS )
    v. )
            ) Case No. <u>03CF1286</u>
<u>LARRY J. CAFFIE JR</u> )
    Defendant ) D.O.S.- <u>2/2/04</u>
            )

### JUDGMENT - SENTENCE TO ILLINOIS DEPARTMENT OF CORRECTIONS

WHEREAS the above named defendant <u>5/1/77</u> has been adjudged guilty of the offenses enumerated below:
                        date of birth

IT IS THEREFORE ORDERED that the defendant be and hereby is sentence to the Illinois Department of Corrections for the term of years and months specified for each offense as.

| Count | Offense | Offense Date | Statutory Citation | Class | Sentence |
|---|---|---|---|---|---|
| 1 | POSS OF A CONTR SUBST WITH INTENT TO DEL | 5/15/02 | 720 570/407(b)(1) | 1 | 4 Yrs. ___ Mos. |

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:

                                                       ___ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:

                                                         ___ Yrs. ___ Mos.

and said sentence shall run (concurrent with) (consecutive to) the sentence imposed on:

Convicted of a class _____ offense but sentenced as a class X offender pursuant to 730 ILCS 5/5-3(c)(8).

The Court finds that the defendant is entitled to receive credit for time actually served in custody (of <u>446</u> days as of the date of this order) (from [specify dates]): _____

The Court further finds that the conduct leading to conviction for the offenses enumerated in counts _____ resulted in great bodily harm to the victim. (730 ILCS 5/3 - 6 - 3(a)(2)(iii)).

IT IS FURTHER ORDERED that the sentence(s) imposed on count(s)_____ be (concurrent with ) (consecutive to) the sentence imposed in case number_____ in the Circuit Court of_____ County; be (concurrent with) (consecutive to) the sentence imposed in case number_____ in the Circuit Court of_____ County; be (concurrent with) (consecutive to) the sentence imposed in case number _____ in the Circuit Court of _____ County.

IT IS FURTHER ORDERED that the Clerk of Court deliver a certified copy of this order to the Sheriff.

IT IS FURTHER ORDERED that the Sheriff take the defendant into custody and deliver him to the Department of Corrections which shall confine said defendant until expiration of his sentence or until he is otherwise released by operation of law.

IT IS FURTHER ORDERED that the Department of Corrections withhold_____% (per cent) [Percentage may not be more than 50%] of the inmate's monthly Corrections income and remit that amount to the_____County Circuit Clerk for application to amounts due in this case for a total amount due of $_____.

IT IS FURTHER ORDERED that <u>DEFENDANT SUBMIT A BLOOD AND/OR TISSUE AND/OR SALIVA SPECIMEN WITHIN 45 DAYS FOR GENETIC MARKER TESTING PURSUANT TO 730 ILCS 5/5-4-3 AND SHALL PAY AN ANALYSIS FEE OF $200.00.</u>

IT IS FURTHER RECOMMENDED that _____

                                             s/ Judge

DATED: <u>FEBRUARY 2, 2004</u>

                                       Judge

PLEASE PRINT JUDGES NAME HERE
<u>ROSEMARY COLLINS</u>

RE: CAFFIE, Larry J.

The defendant was arrested for battering Velma Booker, his girlfriend.

## Criminal History Computation

47. The above-referenced criminal convictions result in a subtotal criminal history score of 35.

48. On January 14, 2005, the defendant was released from custody in Winnebago County, Illinois, Case No. 02-CF-1286 and Kane County, Illinois, Case No. 99-CF-237. Since the defendant committed the instant offense within less than two years following his release from imprisonment, two points are added pursuant to U.S.S.G. § 4A1.1(e).

49. The total of the criminal history points is **37**. According to the Sentencing Table (Chapter 5, Part A), the defendant has a criminal history category of VI.

## Other Criminal Conduct

50. On April 7, 1995, the defendant was arrested for the offense of Battery in Cook County, Illinois, Case No. 95-3002551. Information regarding the defendant's arrest is unknown. Records have been requested but not yet received. On July 12, 1995, this case was dismissed.

51. On October 11, 1996, the defendant was arrested for the offense of Possession of a Controlled Substance as charged in Cook County, Illinois, Case No. 96-3007464. The defendant was arrested following a traffic stop. The defendant was in possession of less than 15 grams of cocaine. On March 6, 1997, this case was dismissed.

52. On October 15, 1996, the defendant was arrested for Unlawful Display of Registration as charged in Cook County, Illinois, Case No. 96-3007552. Information regarding the defendant's arrest is unknown. Records have been requested but not yet received. On March 6, 1997, this case was dismissed.

53. On January 28, 1999, the defendant was arrested for the offense of delivery of a controlled substance. Information regarding the defendant's arrest is unknown. Records have been requested but not yet received. On March 7, 1999, this case was dismissed.

54. On May 5, 2001, the defendant was arrested for Possession of Cannabis with Intent to Deliver in Winnebago County, Illinois,

14

ATTACHMENT # 4

Clerk of the Circuit Court
Kane County, IL

MAY 18 2004

FILED
ENTERED

IN THE CIRCUIT COURT FOR THE SIXTEENTH JUDICIAL CIRCUIT
KANE COUNTY, ILLINOIS

GEN. NO. 99 CF 237

THE PEOPLE OF ILLINOIS

VS.

Larry Caffie

| PLAINTIFF | | DEFENDANT |
|---|---|---|

| JUDGE | Edwards | COURT REPORTER | Dana | PLTF. ATTY. | Kirch CHECK IF PRESENT |
|---|---|---|---|---|---|
| DEPUTY CLERK | Mabel | A copy of this order ☐ should be sent to: ☐ has been sent to: | | DEFT. ATTY. | |

**JUDGMENT ORDER**
Illinois Department of Corrections

Crime For Which Defendant Convicted:
UPCS class 1
Chapter and Section:
720 ILCS 570/402 (a)(2)(A)

Credit for Time Served:
☐ Kane County Jail:

_____ Day(s) _____ Month(s) ☐ NONE
☐ To be determined by Sheriff

☒ Other Credit: IDOC
as determined in case below
(Type/Place/Agency)
_____ Day(s) _____ Month(s) ☐ NONE

Costs of These Proceedings:

Fine                              $ _____

Circuit Clerk's Costs             _____

State's Attorney's Costs          _____

Sheriff's Costs                   _____

Surcharge                         _____

Sub-total _____ (A)

Bond on Deposit     $ _____

Less 10% (if applicable) (_____)

Credit Amount (_____) (B)

BALANCE DUE (A–B)     $ _____

Balance Due:
☐ Instanter ☐ _____ , _____

Sentence of the Court:
_____ Days(s) _____ Month(s) 4 Year(s)
(if applicable):
☒ Concurrent ☐ Consecutive with Case Number(s):
02 CF 1286 from
Winnebago County
☐ Finding of guilty but mentally ill

Municipality of Arrest (if over 25,000 pop.):

THE COURT being advised in the premises;

IT IS HEREBY ORDERED that the defendant named herein is guilty of the crime set forth in this case; and,

IT IS FURTHER ORDERED that the defendant be given credit for such time served as determined by the Court; and, that the defendant pay all costs of these proceedings.

NOW, THEREFORE, is is Ordered, Adjudged and Decreed that the defendant be sentenced to the Illinois Department of Corrections for the crime he/she stands convicted, for a term of days, months or years as set forth herein; and,

FURTHER, that the defendant be taken from the bar of this Court to the Kane County Jail, and from there, by the Sheriff of Kane County, to the nearest reception and classification center of the Illinois Department of Corrections, and the Illinois Department of Corrections is hereby required and commanded to take the body of the defendant and confine him/her in a Penitentiary or State Penal Farm, according to law, from and after delivery thereof until discharged according to law, provided such term of imprisonment shall be not less than nor more than the term of days, months or years for which the defendant stands convicted.

Date 5/18/04 nunc pro tunc 4/15/04
s/ Judge

Enter: _____                    _____

_____
(Judge)

P1-MISC-007   WHITE COPY — Clerk   YELLOW COPY — Dept. of Corrections   PINK COPY — Dept. of Corrections   GOLD COPY — Sheriff

ATTACHMENT # 5

322

1 federal definition of crack cocaine?

2 A.   Somewhat, yes.

3 Q.   What is that as you understand it?

4 A.   The way I understand it, I think they describe

5 it as being perhaps a lumpy or off-white substance

6 which contains cocaine base with the slang term

7 being crack.

8 Q.   You understand it is a street term or a slang

9 term?

10 A.   Yes.

11 Q.   From your examination of the substance, its

12 color, its texture and its chemical composition, did

13 you find that this particular substance was or was

14 not consistent with crack cocaine?

15 A.   I identified it as being cocaine base, so I feel

16 that it meets the guidelines since the definition is

17 of cocaine base with a street term being crack, yes.

18 Q.   Did you thereafter conduct an examination of the

19 substance that was delivered to you as represented

20 by evidence receipt number three?

21 A.   That was my case number M061848.  That exhibit

22 was received on the same day.  That exhibit

23 contained three plastic bags which contained

24 off-white chunks.

25 Q.   Did you perform similar type tests as you've

ATTACHMENT #6

323

1  already indicated with Exhibit 1?

2  A.    Yes, I did.  For those the total weight of the

3  off-white chunks was 1.8 grams.  And I performed the

4  exact same test as I did for the previous exhibit.

5  Q.    And what were the results of those three tests?

6  A.    The primary test indicated cocaine may be

7  present.  The GCMS indicated that cocaine was

8  present.  And the IR showed that it contained

9  cocaine base.

10  Q.    And again from your examination of the

11  substance, not only your visual examination but your

12  chemical testing, did you have an opinion as to

13  whether or not this substance was consistent with

14  the federal definition of crack cocaine?

15  A.    I determined that this contained cocaine base.

16  Q.    And I'm sorry, your question was did you

17  determine whether or not it was consistent with

18  crack cocaine?

19  A.    I identified it as cocaine base and in the law I

20  think it states cocaine base, the slang term is

21  crack for cocaine base.

22  Q.    Was this again an off-white rock-like substance?

23  A.    Each of the bags contained off-white chunks.

24  Q.    And moving on, moving on to the evidence that

25  you received that is represented by our receipt

706

ATTACHMENT #7

1  marked number three.

2  A.    Number four.

3  Q.    I'm sorry, it is four.  You just told us about

4  three, didn't you?

5          And number four, after receiving that

6  exhibit, did you perform certain tests and

7  comparisons on that substance?

8  A.    Yes.  This exhibit was my case number MO61849.

9  I found that it contained nine-tenths of a gram of

10 off-white chunks.  And I performed the same tests

11 with the same results as the previous exhibits.

12 Q.    And with what result?

13 A.    I found that it contained nine-tenths of a gram

14 of off-white chunks which contained cocaine base.

15 Q.    And were the results of the testing of that

16 indeed the same as the substance in Exhibit 1 and 3?

17 A.    That's correct.

18 Q.    And based upon your examination of it and your

19 chemical examination, did you form an opinion as to

20 whether or not that substance was consistent with

21 the federal definition of crack cocaine?

22 A.    Since I identified it as cocaine base, then,

23 yes, I would say that it is consistent.

24 Q.    Now moving on to number 20.  At some point

25 thereafter receiving Exhibit 20 represented by our

ATTACHMENT # 8

329

```
 1  that cocaine was present in each sample that I
 2  tested.  And for the IR, I found that the samples
 3  contained cocaine base.
 4  Q.   For those 52.8 grams that you have indicated
 5  that you did test, did you form an opinion as to
 6  knowing that it was cocaine base whether or not that
 7  substance in each of those sandwich bags was
 8  consistent with crack cocaine?
 9  A.   I identified cocaine base in the substances that
10  I tested and since the definition of crack is
11  cocaine base, then I think it is consistent.
12  Q.   Now let me ask you this.  Each of these
13  substances were an off-white and a chunky or
14  rock-like form; is that correct?
15  A.   That's correct.
16  Q.   In your training have you come to know that
17  cocaine base does exist other than in a rock-like
18  form?
19  A.   Natural occurring cocaine is present as the
20  base?
21  Q.   And is that referred to as coca paste?
22  A.   That's part of the processing.  The actual coca
23  leaves, the cocaine is present as a base form, or I
24  should say there is not a salt form attached to it.
25  Q.   You have been testing items submitted to you at
```

ATTACHMENT #9

336

1 saying.

2 BY MR. SERRITELLA:

3 Q.   Okay.  So the fact is that when you move on to

4 say this is cocaine base, then you move on to say

5 that it is crack, you're saying something in

6 addition to saying that it is cocaine base, aren't

7 you?

8 A.   Well, I thought that I was saying that I

9 determined that it contained cocaine base and then

10 with Mr. Murphy I do feel that it falls into the

11 definition, I determine if it contains cocaine base.

12 The federal guidelines I think state that crack is

13 cocaine base in -- I'm sorry -- I'm not that

14 familiar with the actual terms -- in chunks, I mean,

15 to me I feel like I've determined that these are

16 off-white chunks and they contained cocaine base.

17 Q.   So your opinion is one because they, one,

18 contain cocaine base; and two, because they are

19 off-white chunks, they are crack; would that be a

20 fair statement of your opinion?

21 A.   Yes.

22 Q.   Can you tell me what cocaine base is?

23 A.   Cocaine base and cocaine are interchangeable.

24 There are two forms of usable cocaine.  There is

25 cocaine base or cocaine hydrochloride.  Cocaine base

719

ATTACHMENT #10

337

1   is commonly known as crack.  Cocaine hydrochloride

2   is commonly known as powder and they are ingested

3   differently.  Cocaine itself is produced from coca

4   leaves.  I'm not sure what else you want.

5   Q.   Well, maybe I missed something.  I'm trying to

6   find out what cocaine base is.  How do you define

7   cocaine base?

8   A.   For me to determine if something is cocaine base

9   I need to use the instrument, the IR, that's the

10  only way to distinguish between the base form or the

11  salt form.

12  Q.   Let's go through the test that you did if I

13  could.   The first test is the color test; is that

14  correct?

15  A.   That's correct.

16  Q.   And would it be accurate to say that that is a

17  guide post, that that is something that if it's a

18  blue color you move on to further tests but if it's

19  not a blue color, than you just stop?

20  A.   No.   If it's a blue color that would indicate to

21  me that cocaine may be present so then my next test

22  I'm going to look for cocaine.  If that test had

23  been negative, then I would go on to do more tests

24  and expand my search for substances.  I'm not

25  looking for cocaine at that point.  I'm looking to

720

ATTACHMENT #11                                      338

```
 1  see what it may contain.  At that point it is an
 2  unknown.
 3  Q.   Okay.  So then the color test doesn't prove it's
 4  crack cocaine, does it?
 5  A.   No, it doesn't.
 6  Q.   It doesn't prove that it is cocaine base, does
 7  it?
 8  A.   No.
 9  Q.   And does it even prove that it's cocaine period?
10  A.   It doesn't prove anything.  It's a preliminary
11  test.
12  Q.   Okay.  So it's a guide post.  It is something if
13  you're looking for cocaine, it doesn't come up blue,
14  then you look for something else.
15  A.   That's correct.
16  Q.   All right.  The second test, the mass spectrum
17  test that simply decides for you whether there is
18  cocaine present or not?
19  A.   That's correct.
20  Q.   And once again that doesn't decide whether it is
21  crack or cocaine base, it's just whether there is
22  cocaine present?
23  A.   That's correct.
24  Q.   Then when you move on to the infrared spectrum
25  test, you're saying that that determines whether
```

ATTACHMENT #12

339

1  it's cocaine base or not.

2  A.    That's correct.

3  Q.    Now, when you did the infrared spectrum test, do

4  you test the whole object or do you just test the

5  outside, the outside so to speak, surface of the

6  rock substance?

7  A.    Typically what I do is I have a -- I take a

8  shell vile.  It's a small disposable glass vile.  I

9  will take that and break off a piece of the chunk.

10  I will then grind that up so that I have a

11  hematogenous sample and then that is what I take to

12  perform the test on.  So it's not just the surface

13  of the chunk, it's a piece of the actual chunk

14  itself.

15  Q.    Are you familiar with counterfeit crack?  Have

16  you ever seen that?

17  A.    I see a lot a fake drugs, yes.

18  Q.    Does counterfeit crack appear as a off-white

19  color?

20  A.    It can, yes.

21  Q.    And does it appear in a rock substance?

22  A.    It can.

23  Q.    Now I noticed that when you were testifying you

24  said that -- and I believe the report that I got

25  from the state's attorney, not your words, but

722

ATTACHMENT # 13                                                    340

1   his -- indicate that the substance has the

2   appearance consistent with crack.  Would that be

3   your testimony that the substance has the appearance

4   which is consistent with crack?

5   A.   I don't know if I need -- I proved that the

6   substance contained cocaine base.  So I'm not sure

7   if -- the appearance didn't really come into play as

8   far as my conclusions on my report.  The conclusions

9   on my report are based on the results of my test,

10  not on the appearance.

11  Q.   Okay.  But would you tell me the conclusion of

12  your report again so that I'm clear.

13  A.   My report states that the substances that I

14  tested contained cocaine base.

15  Q.   Okay.  Beyond that, what else?

16  A.   That's -- my report simply states so many grams

17  of off-white chunks cocaine base.

18  Q.   So as you sit here today, you're not prepared to

19  say anything more from your chemical analysis than

20  these substances contained cocaine base?

21  A.   These substances contained cocaine base, yes.

22  Q.   That's the extent of the -- what you're willing

23  to say today as an expert?

24  A.   That's what my report states.

25       MR. SERRITELLA:  If I can just have a

ATTACHMENT #14                                          11

1   at the defendant's residence and the only two
2   questions of any importance is one, was those drugs
3   crack cocaine, and whether those drugs found at the
4   residence were possessed with intent to distribute
5   them.
6         The easy of the two questions is the intent
7   to distribute.  And the evidence proves beyond a
8   reasonable doubt that the drugs were packaged and
9   were in an amount that is consistent with
10  distribution and is not consistent with personal
11  use.
12        The other question which is tough only
13  because it's been argued so strongly by defense
14  counsel is whether or not these drugs were crack
15  cocaine.  Everyone agrees that they were cocaine
16  base, the forensic chemist testified to that.
17  Whether or not they are crack does not depend upon
18  their chemical composition beyond being cocaine
19  base.  It depends upon their appearance, their form,
20  which under the case law requires that the cocaine
21  base be off-white colored hard rock-like substance.
22  These drugs have been described in that way by the
23  various police officers who have had ample
24  experience with crack cocaine and other forms of
25  cocaine such as powder cocaine that they were

ATTACHMENT # 15

118

1 A. It was a bad time in my life, and I was trying

2 to get out of that neighborhood and I let them know

3 that I used.

4 Q. Now you said that the substance that you

5 allegedly bought from the defendant on March 27,

6 2006 was it an off-white substance and it was hard

7 rock?

8 A. Yes.

9 Q. And those were the other two occasions you

10 described the substance the same way; is that

11 correct?

12 A. Yes.

13 Q. And you said that the drugs were packaged in a

14 clear plastic baggie?

15 A. Yes.

16 Q. You've purchased a lot of drugs in your life,

17 haven't you?

18 A. Yes, I have.

19 Q. Have you ever seen any other drugs packaged in a

20 plastic baggie?

21 A. Yes.

22 Q. So, the way they were packaged doesn't tell you

23 that it was crack cocaine, does it?

24 A. No.

25 Q. Then you said it was an off-white substance; is

ATTACHMENT #16

1  that correct?

2  A.   Yes.

3  Q.   Have you ever seen regular cocaine?

4  A.   Yes.

5  Q.   What color is that?

6  A.   It's white, dull white, more of a chalky

7  appearance.

8  Q.   Could it be described as off-white?

9  A.   Sure.

10  Q.   So the color doesn't tell you that it was crack

11  cocaine, does it?

12  A.   No.

13  Q.   So now we know that the packaging and the color

14  don't tell you it was crack cocaine?

15  A.   Correct.

16  Q.   The -- have you ever seen regular cocaine in

17  little rock forms?

18  A.   Generally it's more of a powdery fine substance,

19  but I have seen it.

20  Q.   In a rock form?

21  A.   In a chunk form, yes.

22  Q.   Now the three occasions, March the 21st, the

23  24th and the 28th, you never sampled any of those

24  substances, did you?

25  A.   No, I didn't.

ATTACHMENT # 10

120

1  Q.   So you can't give us an opinion from your

2  experience that those substances that you were

3  supplied with by the defendant on those days,

4  allegedly, that from their use you could tell that

5  they were crack cocaine, isn't that true?

6  A.   Yes.

7  Q.   When you were using this crack cocaine, in March

8  of 2006, were you using any other drugs, or do you

9  just strictly use one thing at a time?

10 A.   One thing at a time.

11 Q.   Say one of your buddies say, hey, I'm smoking a

12 joint of marijuana.  Would you say, oh, no, I'm only

13 doing crack right now or would you take some of the

14 marijuana?

15 A.   No, I quit smoking pot.

16 Q.   How about if the guy had some mescaline?

17 A.   No.

18 Q.   Amphetamines?

19 A.   No.

20 Q.   Heroin?

21 A.   No.

22 Q.   Okay.  So you're saying that you're just a pure

23 guy that just uses crack and that's it?

24 A.   Yes.

25 Q.   And you can tell crack from regular cocaine

1:09-cv-01231-JES (# 1-1  Page 18 of 31
Case 1:06-cr-10029  Document 68  Filed 05/05/2008  age 122 of 245
122

ATTACHMENT # 18

1  whatever, you know it gets you high, don't you?

2  A.  Yes.

3  Q.  And your mind is in an altered state, isn't it?

4  A.  Yes, it is.

5  Q.  And that's the kind of state of mind that you're

6  bringing to judging this substance that you bought

7  off the street with, you're bringing an altered mind

8  when you're judging what it is, isn't that true?

9  A.  I have been doing it long enough.  I can judge

10  and tell pretty much crack from powder.

11  Q.  Let me ask you this.  Isn't it also arguable,

12  sir, that because you have been doing it so long

13  that maybe you've lost some of your mind and your

14  mind wasn't as good as it was 25 years ago, isn't

15  that a possibility also?

16  A.  No.

17  Q.  Okay.  Other drugs get you high, don't they?

18  A.  Like what?

19  Q.  Like other drugs, other illegal drugs, don't

20  they get you high?

21  A.  Yes.

22  Q.  So just to conclude here, we've substantiated

23  that the off-white substance appearance does not

24  mean it is crack, correct?

25  A.  Yes.

ATTACHMENT # 19

1  Q.   The hard rock substance doesn't mean it is

2  crack, correct?

3  A.   Hard white -- you can tell, I mean --

4  Q.   I said hard rock.

5  A.   Hard rock, well there is, no.

6  Q.   And the packaging doesn't mean it's crack,

7  right?

8  A.  Right.

9  Q.  And you didn't smoke it so you don't have an

10  opinion whether from using it it's crack, correct?

11  A.   Correct.

12       MR. SERRITELLA:  If I can just have a

13  minute, Judge?

14       THE COURT:  Uh-huh.

15  BY MR. SERRITELLA:

16  Q.   And the felonies that you were convicted of:

17  deceptive practice, misuse of a credit card,

18  burglary, these all involved moral turpitude, don't

19  they?

20  A.   I don't understand the question.

21  Q.   They involve lying, deceit?

22  A.   Deception maybe.

23  Q.   Yeah.

24       MR. SERRITELLA:  I have no further

25  questions, Your Honor.

ATTACHMENT #20

133

1  pipe and it didn't melt or it tasted funny.

2      THE COURT:  And did that substance look just

3  like crack?

4      THE WITNESS:  Yeah, it appeared to be, yes.

5      THE COURT:  When you touched it, did it look

6  just like crack?  Was it like crack?

7      THE WITNESS:  Yes.

8      THE COURT:  So you're telling me that you

9  really can't tell crack when you get it unless you

10  smoke it?

11      THE WITNESS:  Well you can tell by the

12  appearance.  I mean, a couple times I bought it at

13  night when it was dark and something was hard, so

14  you just took it for granted it was a straight bag.

15  But, yeah, generally unless you sit down and smoke

16  it, you really can't tell the difference between, I

17  mean, you can as far as the rock form, but it's

18  just -- to give it a hundred percent you have to

19  smoke it.

20      THE COURT:  Well, you mean if you right now

21  in the lighted room, if someone gave you crack in

22  one hand and powder cocaine that had been compressed

23  in the other and you had that in your hand and you

24  can feel it and touch it, you're telling me that you

25  wouldn't be able to know the difference?

516

ATTACHMENT #21

134

1    THE WITNESS:  Sure I could.

2    THE COURT:  How would you know the

3  difference?

4    THE WITNESS:  The crack is hard, I mean rock

5  hard and the powder it is a little more puffy.  It

6  leaves, you know, a film to the bag.

7    THE COURT:  So you say that you can feel it

8  and know the difference?

9    THE WITNESS:  Yeah.

10    THE COURT:  So you don't have to smoke it

11  in?

12    THE WITNESS:  No.

13    THE COURT:  And were you able to touch and

14  feel the substance that the defendant gave you on

15  March 21st, 24th and 28th?

16    THE WITNESS:  Yes.

17    THE COURT:  And how did it feel to you?

18    THE WITNESS:  Hard, hard as a rock.

19    THE COURT:  So, in your judgment, what was

20  it, crack or was it something other than crack

21  cocaine?

22    THE WITNESS:  I am sure that it was crack.

23    THE COURT:  Either counsel want to ask this

24  witness anymore questions?

25    MR. CAMPBELL:  Just real quick, Your Honor.

ATTACHMENT #22

343

1  Q.   From the infrared or the mass?

2  A.   From the infrared.

3  Q.   So your testimony here today, as an expert,

4  you -- to reduce your testimony to its simplest form

5  is that you found that these substances contain

6  base?

7  A.   That's correct.

8  Q.   And that's the extent of what you're testifying

9  to here today as an expert?

10  A.   Since I was testifying to my report, yes, that's

11  what my report states.

12  Q.   Well, ma'am, I don't care what your report says.

13  I'm asking you as an expert as you're sitting here

14  today, are you testifying to that?

15       THE COURT:   As a forensic chemist, the only

16  thing you can test for is cocaine base, isn't that

17  correct?

18       THE WITNESS:   Cocaine base or cocaine

19  hydrochloride.

20       THE COURT:   Right.  And that is what you

21  did.

22       THE WITNESS:   Yes.

23       THE COURT:   Now the Government may ask you

24  that there is a federal definition for crack.  Does

25  this cocaine base that you tested consistent with

726

ATTACHMENT #23                                              344

1   that definition, but that wasn't your expert opinion

2   on that, was it?  You just give an opinion.

3         THE WITNESS:  Right.

4         THE COURT:  Because you didn't test for

5   cocaine or crack, you did a test for cocaine base.

6         THE WITNESS:  That's correct.

7         MR. SERRITELLA:  I have no further

8   questions.

9         Thank you, Your Honor.

10                REDIRECT EXAMINATION

11  BY MR. MURPHY:

12  Q.   If I can summarize your testimony, you determine

13  chemically, that these exhibits were cocaine base,

14  correct?

15  A.   That's correct.

16  Q.   And each one of these also were consistent with

17  the federal definition of crack cocaine?

18  A.   I described each one as off-white chunks.

19  Q.   And that is consistent with the federal

20  definition of crack?

21  A.   Yes.

22  Q.   Okay.  Now let's back up here for a moment.  At

23  the bottom of each one of those Exhibits 1, 3, 4 and

24  20 is the notation FED?

25  A.   That's correct.

ATTACHMENT #24

probable cause without the evidentiary hearing scheduled for January 2, 2007 at 1:30 p.m.

"An affidavit has made a proper showing of probable cause when it set forth facts sufficient to induce a reasonably prudent person to believe that a search therein will uncover evidence of a crime." *U.S. v. McNeese*, 901 F.2d at 592. "In deciding whether a search warrant is supported by probable cause, courts must use the flexible totality of the circumstances standard set forth in *Illinois v. Gates*, 462 U.S. 213 (1983)." Id. at 592. As observed by the Circuit Court in *McNeese*, "the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 592.

In the case at bar, there are no statements in the affidavit to connect the observed drug dealing of Defendant, including the controlled buy by the confidential source, with Defendant's residence except apparently an unstated assumption that if Defendant is dealing drugs, he probably stores the drugs or items related thereto at his residence. There is case law in other circuits countenancing this inference as being the type of "practical common sense" assumption contemplated by our circuit in *McNeese*. See *U.S. v. Fama*, 758 F.2d 834 (2nd Cir. 1985); and *U.S. v. Reyes*, 798 F.2d 380 (10th Cir. 1986). There is enough factual support for this presumption in the supporting affidavit of Detective Michael Gray, who avers that he "is aware from his training and extensive experience in narcotics investigations in

3

ATTACHMENT # 25

McLean County that controlled substances can be and are typically hidden throughout so-called 'drug houses' in various locations of said residences" . . . [and] that "drug transactions are often initiated via telephone or with the use of electronic pagers and often times those that sell drugs from said locations will hide or destroy the drugs and/or its proceeds somewhere on their person or persons of others within the residence."

The Court does not find this expert opinion of Officer Gray to be immune from a contrary interpretation since there is nothing in the affidavit to show that Defendant's residence had ever been identified as a "drug house" which is critical to Officer Gray's opinion that drugs are often secreted inside such houses. Assuming *arguendo*, that the absence of that connection would support a finding of a lack of probable cause, this would not be fatal because there is enough factual support to sustain the search and seizure under the "good faith" exception to the exclusionary rule provided by *United States v. Leon*, 468 U.S. 897 (1984). For all these reasons, the motion to suppress is DENIED. The hearing scheduled for **January 2, 2007, is vacated.** This case is set for **status review and personal appearance of Defendant for Friday, December 8, 2006,** at 2:30 p.m.

Entered this ___28th___ day of November, 2006.


_____s/Joe Billy McDade_____
JOE BILLY McDADE
United States District Judge

4

ATTACHMENT #26

1   Q.   Okay.  If I could please, I would like to direct

2   your attention now to March 21st of 2006 and ask you

3   if you in the afternoon hours of that day if you

4   were on duty?

5   A.   Yes, I was.

6   Q.   And were you part of a group of individuals from

7   vice and narcotics that were investigating a

8   individual that you now know is Larry Caffie?

9   A.   Yes.

10   Q.   And ultimately about a week later on June 28th

11   of 2006, did you, sir, personally arrest Larry

12   Caffie?

13   A.   Yes, I did.

14   Q.   And is the Larry Caffie that you arrested on

15   that date present in court here today?

16   A.   Yes, he is.

17   Q.   Will you point directly at him?

18   A.   It is the gentleman in the green jump suit with

19   a white long-john top underneath.

20        MR. MURPHY:  Will the record reflect that he

21   has pointed to the defendant?

22        THE COURT:  The record will reflect.

23   BY MR. MURPHY:

24   Q.  Detective Walcott, what I would like to do is go

25   back to March 31st with that day, did you attend a

387

ATTACHMENT #27

1    surveillance briefing that was held at about 4:30 in

2    the afternoon that day?

3    A.    Yes, I did.

4    Q.    What was your assignment that day, sir?

5    A.    Static surveillance in the Franzetti's lot.

6    Q.    And in addition to just being a surveillance

7    officer, did you have some other special duty that

8    was assigned?

9    A.    Yes.

10    Q.    What was that?

11    A.    I was to videotape any activity at that

12    location.

13    Q.    In fact that afternoon did you -- some time

14    shortly before 5:00, did you set up and did you in

15    fact videotape at that location?

16    A.    Yes, I did.

17    Q.    I have -- or you have produced and I have asked

18    you to review Government's Exhibit Number 2 which is

19    a DVD, correct?

20    A.    Yes.

21    Q.    And you have reviewed that DVD?

22    A.    Yes.

23    Q.    And you -- does it contain scenes that you

24    videotaped on March 21st, 2006?

25    A.    Yes, it does.

ATTACHMENT #28

1  the video.  And we would like to play the video at

2  this point, Judge.

3       MR. SERRITELLA:  I would like to reserve my

4  objection.

5       MR. MURPHY:  You can see it much better on

6  the small screens, Judge.  I don't know if it will

7  work on the big screen.

8       (Playing video.)

9  BY MR. MURPHY:

10  Q.  What is happening here at this point?  What are

11  you videoing at this point?

12  A.  The informant at the pay phone making a phone

13  call.

14  Q.  Okay.  If -- although you video that vehicle,

15  that's not the vehicle that Mr. Caffie pulled up in?

16  A.  No, it was not.

17  Q.  And that's not Mr. Caffie?

18  A.  No.

19  Q.  And a point, in fact, you didn't know what kind

20  of vehicle Mr. Caffie would be showing up in?

21  A.  We were told that he drove several vehicles

22  every once in a while.

23  Q.  Is that the informant again back on that side of

24  the building?

25  A.  Yes, it is.

ATTACHMENT #29

1 A. I monitored the surveillance activities, the
2 officers conducted talking back and forth.
3 Basically heard them say that the vehicle had left
4 the parking lot and appeared to be going around the
5 block to the east.
6 Q. When you say monitored, were all of the officers
7 involved in the investigation at the surveillance,
8 various locations able to hear what was going on
9 between themselves as one officer said one thing and
10 observed something and another officer would see
11 something else?
12 A. Yes, it is a group channel on a Nextel phone.
13 It is similar to a two-way radio.
14 Q. Okay. What is the next thing that you saw occur
15 during this course of events?
16 A. I saw the front of the Buick that I had seen
17 enter the parking lot come through the -- through
18 the alley westbound on the south side of Franzetti's
19 here towards Clinton Street and then Mr. Fowler was
20 out of the vehicle and walked back towards me.
21 Q. And he came directly to you?
22 A. Yes, sir.
23 Q. And got in the vehicle you were in?
24 A. Yes, sir.
25 Q. What happened then?

# Law Offices of Hannah Garst

4530 North Magnolia, #1n

Chicago, IL 60640

773-248-6504

773-989-8540 (fax)

ATTACHMENT #30

July 15, 2008

Larry J. Caffie, #13472026
USP Big Sandy
P.O. Box 2068
Inez, KY 41224

Dear Mr. Caffie:

I received your letter, and honestly, I am not sure what to make of it.  I understand your concern about words being written incorrectly, wording being changed, and the wrong people being quoted for questions.  At this point, however, there is nothing I can do about this.  The court reporters record the proceedings and transcribe them word for word.  Therefore, the court reviews the transcripts as prepared.  I haven't quite finished reading all of the transcripts yet, but I should be finished soon.  I would like to talk to you once I am through reviewing the record.  Are you still in segregation?  Please let me know.

Sincerely,

Hannah Garst

SUBPOENA

# Law Offices of Hannah Garst

ATTACHMENT #31

4530 North Magnolia, #1n

Chicago, IL 60640

773-248-6504

773-989-8540 (fax)

September 29, 2008

Larry J. Caffie, #13472026
FCI Butner
P.O. Box 1500
Butner, NC 27509

Dear Mr. Caffie:

Here are the documents we discussed on Friday.  I am also enclosing 21
U.S.C. §§ 841(a) & 851 for your review.  As for the Dekalb County Felony
Obstruction of Justice conviction, the case number is 99-CF-31 and occurred
on May 7, 1999.  I hope this helps.  Let me know if you have any more
questions.

Sincerely,

Hannah Garst